TALIAFERRO, Judge.
Plaintiff sued his employer, General Construction Company, to recover workmen’s compensation on the theory that from the effects of an accident while performing his' duties under a contract of hiring with defendant, he is now and had been since the date thereof, totally and permanently disabled to do work of a reasonable character. The accident is alleged to have occurred on September 2, 1948. The nature of the injury sustained is “severe strain of the lumibodorsal” while pulling steel forms from •around set concrete. It is alleged also that as a direct consequence of said injury he has “developed arthritis in the lower dorsal vertebrae and in all five lumbar vertebrae joints”; that because of said injury he suffers pain in his back and soreness and stiffness in the lower segment thereof, from about the ninth dorsal vertebra down.
Defendant denies that plaintiff had the accident as by him alleged, and denies that he has been or now is disabled from the effects of an accident occurring to him while in its employment. Defendant admits that to give plaintiff the benefit of all possible doubt that he was temporarily injured, as claimed by him, it paid to him $197.60, as compensation for 8 weeks, at $24.70 per week.
Judgment Was awarded plaintiff on the basis of permanent total disability or for 400 weeks, at the rate of $24.70 per week, less admitted payments. Defendant appealed, after unsuccessful effort for rehearing or new trial. The appeal has not been answered by the appellee, but in his counsel’s brief affirmance of the judgment is asked.
Appellant earnestly argues that if plaintiff experienced any accident at all, it was so slight that he not only suffered no permanent disability therefrom, but no disability at all.
The nature and facts of the alleged accident are expressed by plaintiff in the following language, to wit: “Me (sic) and Richmond Nash were working together .and pulling the forms and so I got to the form and it was down in the ditch, and it had. *57 a pin at one end of it, and the pin — I didn’t know the pin was in there — and the concrete was over the pin, and it got hard and I went down and jerked up on it, and I just hurt my back, and I couldn’t get no further than my knees.”
He testified that his “boss man” was not present when the accident occurred, but soon afterward appeared and was informed of it; that the “boss” directed him to go to the office and get a “slip” to the doctor. As it was then about quitting time (in the afternoon), he says he did not go to the office until the following morning, After getting the “slip” he reported to Dr. S. W. Boyce, the defendant’s employed physician. He was then complaining of severe pain in the lower portion of his back, and is positive that from that time to the date of trial, February 2, 1950, he has not performed and is now unable to perform manual labor.
Dr. Boyce is uncertain whether plaintiff came to his office on September 2nd or September 13th, but he knows that he did come to see him in September, 1948, for examination and treatment. A close physical examination was made but no X-rays were taken as the asserted injury and the symptoms were deemed by Dr. Boyce so trivial as not to warrant this being done. He could find no evidence of trauma to account for the pain plaintiff stated he was experiencing. Dr. Boyce testified that there was scarcely a time when he did not have one or more cases of this character under treatment and where no complications were present, as was true of plaintiff’s case, ability to resume work in two weeks was expected and was the rule. He found plaintiff’s teeth and tonsils to be infected and stated that these conditions could produce back aches, but not disability to work. Plaintiff reported to Dr. Boyce four or five times over a, period of about two weeks, and was treated. He was not discharged, but, of his own accord, ceased going to the doctor.
Dr. A. P. Addison, Jr., on October 25, 1948, closely examined the plaintiff. He found the teeth and gums badly diseased, and tonsils infected. The prostate glands were enlarged, boggy, and tender to touch, not attributable to trauma. Wassermann test was positive. X-ray pictures disclosed no injury or abnormality of the sacro-iliac joints, nor of the region about, particularly the vertebrae, but did reveal some hyper-trophic arthritic changes. This clinical condition, Dr. Addison was certain, had existed for some years. It slowly develops and is not always due to trauma. It was not sufficiently serious in nature and development to prevent the perf ormance of manual labor. In view of the negative findings of Dr. Addison, based upon X-ray and manipulation, it was his opinion that had plaintiff had an accident, the character of which he gave the doctor, all ill effects therefrom should have disappeared within a few weeks, — two or three months at the longest.
Drs. Paul D. Abramson and J. E. Heard, connected with the North Louisiana Clinic in Shreveport, Louisiana, together examined plaintiff physically and had X-ray pictures of his lower back and sacro-iliac joints made in April, 1949, at which time plaintiff was complaining of pain in those regions, said by him to be so serious and incessant as to render him wholly incapable of doing hard work. They were unable to find any evidence of injury of the X-rayed portions of the body. They did find evidence of mild arthritis or rheumatism, which, of itself, was not disabling. They also observed some bilateral muscular rigidity or spasms in the lower portion of the back, but believed these to be voluntary on the patient’s part, and were of the opinion that, on the whole, plaintiff was exaggerating whatever pain he had. It was their opinion, based upon their fundings, and long experience, that plaintiff, being only 53 years old, could discharge labor of the sort he was performing when the alleged accident occurred, if it did occur, within two or three months thereafter.
Dr. G. H. Cassity testified on behalf of the plaintiff. Pie examined him first on November 18, 1948. We quote from the case history given by him to Dr. Cassity, to wit: “He stated that on September 1st, 1948, while lifting on a concrete form, he suddenly felt a severe pain in the small of his back, and that it was 'so severe that he couldn’t straighten up for a few minutes ■and couldn’t do any more lifting that dáy. *58 He went back on the job the next morning ■but his 'back was so sore and painful that he. could not do any work, nor hardly walk, and so his foreman sent him to the doctor. He then went home for the day but went • on the job again the next day and tried to work, but made 'a very poor out of it, and the next day he could not do any work at all and has not been able to work since. His chief complaint now and since his injury is a sore and stiff back, particularly at the lumibo-dorsal region.”
Dr. Oassity made no X-ray pictures of any part of the man’s body, and formed conclusions, as to his physical condition, from his own statements and from manipulations, etc. His conclusion was that plaintiff had suffered a “severe strain at the lumibo-dorsal joint”. He thought it possible that one of the articular facets, between the twelfth dorsal and first lumbar vertebra had been fractured. He was of the opinion that an accident of the sort alleged upon could 'have produced the pathology he found, and that total disability followed. The following is a resumé of Dr. Cas-sity’s ultimate conclusions, viz.: “Well, I wouldn’t say that he is permanently disabled. I would say there is a possibility that he is partially permanently disabled. My opinion on that would depend somewhat on X-ray pictures of his spinal column, which I have not had the advantage of seeing. And if he has developed arthritis in those lumbar joints and at the dorsal lumbar joint to some extent, since the injury, then he undoubtedly will have a fair degree of permanent disability for hard work. If there is no arthritis developed along those joints, then he could very likely expect to get well entirely.”
In connection with these conclusions it is here opportune to say that not one of the several X-ray pictures taken disclose any pathology about the lower part of the back and the sacro-iliac joints, save the arthritis above mentioned, and this is shown to have been of an age that long antedates the time of the alleged injury.
Plaintiff made seven or eight visits to : Dr. Cassity’s office and was treated .by him. The last time he examined him was on , April 6, 1949. He observed little or no improvement in his condition.. He found the tonsils, teeth and gums to. be in diseased condition, and testified that the pus therefrom could cause back pains. He also found rigidity of the muscles of the lower part of the spinal column and was certain this condition was involuntary. Like the other physicians, he was certain that an injury of the character asserted by plaintiff should within a very brief time produce pain so severe that the patient would be unable to do work. He did not believe plaintiff at date of trial, was able to do the sort of work he was doing when the alleged accident occurred.
Plaintiff says he quit going to Dr. Boyce for treatment because he was not improving n his condition. He did not give any reason why he ceased calling on Dr. Cassi’ty for professional aid. He was asked why he did not go to the Charity Hospital in Shreveport for professional service after his money gave out, if he was paining so intensely and relentlessly as asserted by him, to which he answered: “I don’t know;. I just didn’t go.”
Marvin Crawford, a fellow workman, testified that he was at plaintiff’s side when the accident is supposed to have occurred. He testified that plaintiff told, him he “had hurt his back and said he couldn’t tote any more forms.” He added: “He picked up too hard, I guess.” He did not say he saw plaintiff fall to his knees when the accident occurred. He further testified:
“Q. What did he do when he was picking up that made you think he was hurt? A. He quit lifting them and told me he had hurt his back.
Q. You didn’t see anything' happen to him — he just told you he hurt his back? A. Yes, sir.
“Q. You didn’t see arfything happen yourself? A. No, sir, nothing but him picking up.”
He stated also that plaintiff did not work any more on that job after being hurt, and, further, if he had done so he would have worked with him.
In his testimony, quoted supra, plaintiff stated that he and Richmond Nash .were working together. He did not mention *59 Crawford as being by his side; not even' that hé was working on thé same job.
Nash was introduced as a witness for the plaintiff, but his testimony is quite unfavorable to him. As regards an accident, all he knew aboút it was told to him by plaintiff himself, and he could not recall if this was done the day of the alleged accident or riot. He is positive plaintiff worked at least three weeks after telling him he had hurt himself, and that prior to that time he had heard plaintiff often complain of pain in his -back. If plaintiff had fallen to his knees when he felt the alleged sharp pain in his back at time of the accident, surely this man and the witness, Crawford, would have seen it.
It is established beyond question that plaintiff worked the entire month of September, 1948, and drew his wages regularly therefor, notwithstanding he persisted in testifying that he did not work for the defendant nor try to, after September 2nd, the date of the alleged accident. He told Dr. Cassity. he reported for duty two or three different days after September 2nd, and tried to work, but could not do so. His own witness, Nash, corroborates defendant’s records and the keeper of the pay rolls by testifying that plaintiff worked at least three weeks thereafter.
Testimony of other lay witnesses proves that plaintiff complains much of sharp pains ■in his back, walks abnormally with the aid of a cane, and has not worked any since leaving defendant’s employ. It is also shown that to the time of the alleged accident he was able to perform the work assigned to him.
Of course, afflicted as he was by the mentioned ailments, plaintiff could not be expected to perform hard labor as long as one not so beset. Of necessity, human strength and stamina, under such adverse conditions, have to give way, and this could have happened, and does often happen, in such circumstances without the intervention of an accident.
It is conceded that if an accident activates a pre-existing' dormant pathology, from which ’ disability to work results, such disability is compensable; but, as a condition precedent to this, it must be established to a court’s satisfaction that an accident, within the meaning of the Workmen’s Compensation Daw, actually occurred. Our study of the record has not convinced us that the accident really happened, but we will add if one did happen, it was so slight that plaintiff now suffers no disability therefrom.
The medical testimony heavily preponderates against him. His witness, Crawford, equivocated and his witness, Nash, contradicted him on material points. His own credibility for the reasons assigned, is materially affected. All things considered, it is quite clear to us that he failed to make out a case.
It is argued by plaintiff’s counsel that by the payment of eight weeks’ compensation, defendant admitted plaintiff’s disability on the grounds alleged. This position is not well founded. It is expressly provided in the Workmen’s Compensation Law that such payments do not amount -to admission of liability for the payment of compensation to an injured employee. But for this protection, an employer could rarely afford to make any sort of financial advances to an injured employee although the urge to do so be supported by humane reasons and considerations. Workmen’s Coinpensation Law, Act No. 20 of 1914, § 18, subd. 5, Amended Act No. 85 of 1926.
It is not shown when the $197.60 was paid, but, presumably, it was in bulk and was based upon the doctors’ opinions that if' disabled from an accident, recovery to resume work would require about two months.
For the reasons herein assigned, we are constrained to reverse the judgment from which appealed, and dismiss the suit, and it is so ordered, at plaintiff’s cost.